**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:17 cv 282**

| | | |
|---|---|---|
| **RELION MANUFACTURING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| **TRI-PAC, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Before the Court is Defendant's Motion to Dismiss. [# 6]. On October 10, 2017, Plaintiff filed its Complaint asserting claims of breach of contract; breach of express warranty; breach of implied warranty: fitness for particular purpose; and breach of implied warranty: merchantability. [# 1]. On January 8, 2018, Defendant filed its Motion to Dismiss. [# 6]. The District Court referred the Motion to this Court. Accordingly, Defendant's Motion is now before this Court for a Memorandum and Recommendation to the District Court. The Court will recommend the District Court deny Defendant's Motion to Dismiss. [# 6].

## I.    Relevant Factual Background

Plaintiff is a corporation organized under North Carolina law. [Compl. ¶ 1]. Plaintiff's principal place of business is in Asheville, North Carolina. [Id.]. Defendant is a corporation organized under Michigan law. [Id. at ¶ 2]. Defendant's principal place of business is in Vandalia, Michigan. [Id.].

Plaintiff is a contract manufacturing and packaging provider. [Id. at ¶ 6]. Plaintiff is

also the manufacturing arm for Avadim Technologies, Inc. (Avadim). [Id.]. Avadim develops topical medical therapies for infection protection, muscle cramp relief, muscle cramp prevention, and more. [Compl. ¶ 6]. Defendant provides contract filling and packaging services to marketers of aerosol, liquid, and specialty packaged products. [Id. at ¶ 7].

On July 7, 2016, Plaintiff alleges the parties entered into a Commercial Agreement. [Id. at ¶ 8]. The Agreement outlined that Defendant would provide manufacturing and packaging services for Avadim products. [See Compl. Ex. 1] [hereinafter Agreement]. Under the Agreement, Plaintiff would send its bulk product to Defendant. [Compl. at ¶ 8]. Defendant would take the bulk product and fill individual bottles, cap the bottles, package them, and ship them back to Plaintiff. [Id.].[1]

---

[1] The Agreement contained, inter alia, the following terms:

**Quality Control:** [Defendant] will carry out standard quality control procedures on all customer production runs. Customer is responsible for the quality and efficacy of any customer supplied chemical(s), chemical mixtures, components, and packaging materials. [Agreement p. 1, ¶ 8].

**Shipments:** [Defendant] will make all shipments on designated carriers with bills of lading and packaging lists. Shipments will be insured by the customer and FOB [Defendant's] warehouse. [Id. at p. 2, ¶ 2].

**Term:** Either party may terminate this agreement by means of 30 days prior written notice or cancelled [sic] immediately upon mutual agreement of the parties. The agreement shall expire in any event as of December 31, 2016. The parties will attempt to negotiate in good faith an acceptable Commercial Agreement before the expiration of this agreement. [Id. at p. 2, ¶ 4]. The terms of this Commercial Agreement are dependent upon the simultaneous execution of the agreement entitled, "ATI and Relion Confidentiality and Nondisclosure Agreement with Tri-Pac Respecting Independent Contractor Services" ("NDA"). Neither agreement shall be operative unless both agreements are signed simultaneously. [Id. at p. 2, ¶ 5].

On October 20, 2016, Defendant submitted to Plaintiff a written quotation for Defendant's manufacturing and packing of Plaintiff's "performance spray" products. [Id. at ¶ 10]. Plaintiff was to provide the bulk product, labels, and carton artwork. [*See* Compl. Ex. 2]. Among other things, Defendant would provide: can, valve, spray thru cap, incoming quality control, and quality assurance/quality control. [Id.]. Defendant was responsible for filling customer supplied product in cans per specification; application and crimping of valve; pressurizing container with propellant/compressed gas; and application of actuator/over cap. [Id.].

Plaintiff placed three orders with Defendant reflected in three purchase orders appended to the Complaint. [*See* Compl. Ex. 3].[2] As the purchase orders came in, Defendant began producing and delivering batches of spray products to Plaintiff. [Compl.

_____

**Warranty:** [Defendant] warrants the finished products for workmanship and manufacturing defects for a period of 1 year. [Id. at p. 2, ¶ 6].

**Dispute Resolution:** In the event of disagreement or dispute regarding any matter that cannot be resolved after good faith efforts, the parties agree to seek professional mediation in an effort to achieve resolution. If resolution cannot be achieved via mediation, the parties will be free to pursue other legal or equitable remedies as may be appropriate. [Id. at p. 2, ¶ 8].

[2] **Purchase Order No. 100557** is dated May 10, 2016. [Compl. Ex. 3, p. 1]. Plaintiff ordered 25,032 units of "aerosol bottle filling" for its performance spray products at a unit cost of $1.45—total cost $36,296.40. [Id.].
**Purchase Order No. 100798** is dated September 23, 2016. [Id. at p. 2]. Plaintiff ordered 75,000 units of "aerosol bottle filling" for its performance spray products at a unit cost of $1.42—total cost $106,500.00. [Id.].
**Purchase Order No. 100851** is dated October 21, 2016. [Id. at p. 3]. Plaintiff ordered 200,000 units of "Performance Spray Theraworx Relief, which the Purchase Order specified was "NEEDED ASAP" by [Plaintiff], and 300,000 units of Performance Spray Theraworx Relief, to be supplied at a date "TBD."" [Compl. ¶ 11(c); Ex. 3 p. 3]. This Purchase Order was later modified for different packaging that increased the unit cost to $1.48—total cost $740,000.00. [Compl. ¶ 11(c); Ex. 3 p. 3].

3

¶ 12].

In January 2017, Plaintiff emailed Defendant stating it was receiving complaints from the first batch of Defendant's spray products. [Id. at ¶ 13]. In February 2017, Plaintiff emailed Defendant stating it would be sending Defendant samples of the defective units. [Id. at ¶ 14]. The defective units continued to spray 3 to 10 seconds after the actuator was released and/or the unit significantly leaked. [Id.]. Plaintiff told Defendant the defects were a matter of great concern because Plaintiff was attempting to launch one of the spray products that Defendant was manufacturing and packaging. [Compl. at ¶ 14]. Additionally, Plaintiff stated another spray product that Defendant was manufacturing was intended for retail sale; spray defects like those discovered by Plaintiff would be disastrous for Plaintiff in the consumer market. [Id.].

On March 9, 2017, Defendant emailed Plaintiff admitting there had been spraying defects with the units. [Id. at ¶ 15]. Defendant stated curing the defects was its "top priority" and it was "evaluating all possible outcomes to offer a permanent solution on the current and all future runs." [Id.]. Plaintiff alleges, however, Defendant continued to deliver defective units. [Id. at ¶ 16]. On March 14, 2017, Defendant emailed Plaintiff admitting that units from subsequent shipments had "similar quality issues." [Id.].

Plaintiff alleges the existence of a meeting agenda memorandum. [Compl. at ¶ 16].[3] In the memo, Defendant acknowledged that Plaintiff had rejected all four lots of spray products delivered by Defendant. [Id.]. Defendant summarized the problem: "[t]he product

---

[3] The Court infers that this meeting agenda memorandum was created around March 14, 2017.

keeps on spraying after release of finger from the actuator and may lead to other damages and will confuse consumer. This will result in product recall from the market and will damage customer brand." [Id.]. The memo also stated Plaintiff had "cancelled [sic] their consumer launch due to stem sticking issue and asking for replacement." [Id.].

On March 23, 2017, representatives of Plaintiff, Defendant, and Defendant's valve manufacturer met to discuss possible resolutions to the defective products. [Id. at ¶ 17]. The minutes of the meeting reflect "as of 3/24/17 entire lot of 284,000 [units] in [Plaintiff's] warehouse and additional 21,000 (pending partial returns) remains rejected and to be replaced." [Id.].

On May 3, 2017, Plaintiff provided Defendant a preliminary accounting of the costs Plaintiff had incurred up to that date due to Defendant's defective units. [Compl. ¶ 18; Ex. 4]. The accounting included materials, labor, shipping, and sterilization—totaling $565,880.49. [Compl. ¶ 18]. The accounting did not include costs related to disposal of the defective units. [Id.]. Plaintiff requested Defendant handle disposal. [Id.].

On June 5, 2017, Plaintiff emailed Defendant stating it was rejecting all lots manufactured by Defendant "due to an unacceptable number of defective units with sticking actuators as well as defective units with spray pattern issues." [Id. at ¶ 19].

On or about August 31, 2017, the parties held a meeting which produced another 'meeting agenda memorandum.' [Compl. at ¶ 20]. In the memo, Defendant acknowledged that lots 3 and 4 it had manufactured for Plaintiff were "on hold due to stem sticking issue." [Id.]. The memo also stated Defendant proposed replacing the defective actuators with a different actuator. [Id.]. Plaintiff rejected this. [Id.]. Replacing the actuator would require

5

another sterilization and would have negative effects on the efficacy of the product. [Id.]. Plaintiff notes that replacement of the actuator would not have cured the root problem of the defective stem. [Compl. at ¶ 20]. Defendant had previously admitted to this as well. [Id.].

Since the meeting on August 31, 2017, Defendant has not remedied the manufacturing defects. [Id. at ¶ 21]. Defendant has not refunded Plaintiff the amounts Plaintiff paid under the Agreement and purchase orders. [Id.]. Defendant has not compensated Plaintiff for costs incurred because of the defective units. [Id.]. Plaintiff has incurred substantial costs and suffered damages in excess of $75,000. [Id. at ¶¶ 22–26].

## II.     Legal Standards

**Federal Rule of Civil Procedure 12(b)(2).** A plaintiff bears the burden of proving that a district court has personal jurisdiction over a defendant by a preponderance of the evidence. New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005). Courts are provided flexibility in how the address a motion to dismiss for lack of personal jurisdiction. For example, a court may rule on the motion based on the pleadings, hold an evidentiary hearing, or allow jurisdictional discovery prior to ruling on the motion. See Marx Indus., Inc. v. Chestnut Ridge Foam, Inc., 903 F. Supp. 2d 358, 362 (W.D.N.C. 2012). When a district court rules on a defendant's Rule 12(b)(2) motion to dismiss without an evidentiary hearing, a plaintiff need only set forth a prima facie case that the court has personal jurisdiction over the defendant. Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993) (citing Combs v. Baker, 886 F.2d 673, 676 (4th Cir. 1989). In determining whether a plaintiff has made this prima facie showing, a court construes the

allegations in the complaint in the light most favorable to the plaintiff and must resolve all factual disputes in favor of the plaintiff. New Wellington, 416 F.3d at 294.

In order to determine whether a plaintiff have satisfied its burden, a court must engage in a two-step analysis. Ellicott Mach. Corp ., Inc. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). First, the Court must determine whether the exercise of jurisdiction over a nonresident defendant is authorized by North Carolina's long-arm statute. Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014). Second, the Court considers whether the exercise of jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment. Id. Because the North Carolina Supreme Court has interpreted the state's long-arm statute to reach the constitutional limits of due process, Dillon v. Numismatic Funding Corp., 231 S.E.2d 629, 630–31 (N.C.1977), courts have compressed this two-step inquiry into a single inquiry. Universal Leather, 773 F.3d at 558–59; Young v. AGCO Corp., No. 1:13-CV-54-MR-DLH, 2014 WL 1266993, at *4 (W.D.N.C. Mar. 26, 2014).

Personal jurisdiction may either be specific or general. See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301 (4th Cir. 2012). Where a defendant's contacts with the forum state also provide the basis for the suit against the defendant, the contacts may establish specific jurisdiction. Id. at 301; see also McGee v. Int'l Life ins. Co., 355 U.S. 220, 222–24 (1957). A court considers "three factors when determining whether a court has personal jurisdiction over a nonresident defendant: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities;

7

and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Tire Eng'g, 682 F.3d at 301–02 (citing CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 294 (4th Cir. 2009)). In contrast, where a defendant's contacts with the forum state are not also the basis of the claims, then jurisdiction over the defendant must constitute general jurisdiction. Tire Eng'g, 682 F.3d at 301. To establish general jurisdiction a defendant must have "continuous and systematic" activities in the forum state. Id. (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).

**Federal Rule of Civil Procedure 12(b)(6).** The central issue for resolving a Rule 12(b)(6) motion is whether the claims state a plausible claim for relief. *See* Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009). In considering a defendant's motion, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 190–92. Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ." Consumeraffairs.com, 591 F.3d at 255; *see also* Giacomelli, 588 F.3d at 189.

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007); *see also* Consumeraffairs.com, 591 F.3d at 256. "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S. Ct. at 1965. Nor will mere labels

and legal conclusions suffice. Id. Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

The complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; *see also* Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. *See also* Consumeraffairs.com, 591 F.3d at 255. The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; Consumeraffairs.com, 591 F.3d at 256.

## III. Analysis

### A. Specific Jurisdiction[4]

Neither party moved for an evidentiary hearing; the Court finds it does not require one for its recommendations to the District Court. In determining whether Plaintiff has made a prima facie showing of specific jurisdiction—by a preponderance of the evidence—the Court may look to "motion papers, supporting legal memoranda and the relevant allegations of a complaint." Combs, 886 F.2d at 676. The Court reiterates it must "construe

---

[4] Neither party argues for or against general jurisdiction, thus the Court dispenses with that analysis.

9

all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inference for the existence of jurisdiction." <u>Id.</u> The parties have appended affidavits and other supporting legal memoranda to the pleadings. The Court will outline the material it considered outside the Complaint for the purpose of Defendant's 12(b)(2) motion.

### a. Defendant's Affidavit—January 8, 2018

Defendant's Motion to Dismiss included an affidavit from Vikram Shah, President of Tri-Pac, Inc. [# 6 Ex. 2] [hereinafter *Def.'s Aff. I*]. Shah based the affidavit on his own personal knowledge or "upon information provided to me from authorized Tri-Pac employees who inform [Shah] that these statements are true." [Def.'s Aff. I ¶ 1].

Defendant is a Michigan corporation with its headquarters and only location in Vandalia, Michigan. [<u>Id.</u> at ¶¶ 2, 10]. Defendant manufactured custom aerosol-filled containers for Plaintiff. [<u>Id.</u> at ¶ 3]. Defendant does not develop, design, or manufacture products in North Carolina. [<u>Id.</u>].

Plaintiff initiated contact with Defendant. [<u>Id.</u> at ¶ 4]. Plaintiff requested custom manufacturing services by Defendant to be performed in Michigan. [<u>Id.</u>]. Defendant and Plaintiff had not had any pervious dealings prior to this contact. [Def.'s Aff. I ¶ 4]. Defendant contracted with a third party to supply key components for its custom manufacturing for Plaintiff. [<u>Id.</u> at ¶ 5]. The third party completed the work at its manufacturing facility "in the Chicago, Illinois area." [<u>Id.</u>].

Defendant has never conducted business in North Carolina. [<u>Id.</u> at ¶ 6]. Defendant does not maintain a physical presence in North Carolina. [<u>Id.</u>]. Defendant does not have

any employees, officers, directors, or managing agents in North Carolina. [Id.]. Defendant does not own, lease rent or otherwise possess real property in North Carolina. [Def.'s Aff. I ¶ 6]. Defendant does not maintain any mailing address, telephone number, or fax number in North Carolina. [Id.]. Defendant does not have any bank accounts in North Carolina. [Id. at ¶ 7]. Defendant does not pay taxes or file tax returns in North Carolina. [Id. at ¶ 8]. Defendant does not have a registered agent for service of process in North Carolina. [Id. at ¶ 9].

Defendant had no knowledge or control to whom Plaintiff would subsequently sell the aerosol products. [Id. at ¶ 11]. Once Defendant completed its manufacturing and packaging, Plaintiff via a third party would pick up the product in Vandalia, Michigan. [Def.'s Aff. I ¶ 11]. Plaintiff assumed ownership and risk of loss for its products in Michigan. [Id.]. Defendant has no participation in or control over third party sales or distribution of any product it manufactures. [Id. at ¶ 12]. Defendant does not give advice or direction to its customers regarding the distribution of the products Defendant manufactures. [Id.].

As part of its United States marketing efforts, Defendant occasionally attends trade shows. [Id. at ¶ 13]. But it has never attended a trade show in North Carolina. [Id.]. Defendant has a corporate website available to the world. [Def.'s Aff. I ¶ 14]. The website supplies general information about Defendant and its custom manufacturing services. [Id.]. The website does not provide an online point of sale. [Id.].

The research, design, development, and assembly of the products took place in Vandalia, Michigan. [Id. at ¶ 15]. Defendant's foreseeable witnesses live, reside, or work

in Michigan. [Id. at ¶¶ 15–16]. Defendant's business documents and records regarding this case are located in Michigan. [Id.].

After learning of Plaintiff's concerns regarding certain aerosol products, Shah met with Plaintiff to attempt to resolve the claims. [Def.'s Aff. I ¶ 17]. Defendant and Plaintiff did not "engage in any professional mediation or meet with a third-party mediator in an effort to resolve this claim and [Plaintiff] did not offer to do so prior to filing its Complaint on October 10, 2017." [Id.].

### b. Plaintiff's Affidavit & Email—February 9, 2018

Plaintiff's Response in Opposition [# 17] included 1) an affidavit from Josh Montgomery, Vice President of Manufacturing of Relion Manufacturing, Inc.; and 2) an email and letter between Relion's counsel and Defendant that included a copy of Plaintiff's Complaint and exhibits.

The Affidavit. Josh Montgomery is Vice President of Manufacturing of Relion Manufacturing, Inc. [# 17 Ex. 2, ¶ 1] [hereinafter *Pl.'s Aff.*]. Montgomery is familiar with this matter and submits his affidavit based on his own personal knowledge. [Pl.'s Aff. ¶¶ 2–3]. In 2016, Montgomery was searching for a company to provide packaging services. [Id. at ¶ 5]. Montgomery found Defendant's company via its website through an internet search. [Id.]. Based on Defendant's representations and communication between the parties, Plaintiff and Defendant agreed to enter into a commercial contract. [Id. at ¶¶ 6–7].

On July 7, 2016, the Commercial Agreement between Plaintiff and Defendant came into effect. [Id. at ¶ 8]. Plaintiff attached a true and accurate copy of the Agreement to its Complaint. [Id.]. On or around September 15, 2016, Defendant transmitted a signed

Agreement by email to Plaintiff's headquarters located in Asheville, North Carolina. [Pl.'s Aff. ¶ 9]. On or around September 22, 2016, Montgomery executed the Agreement in North Carolina and emailed it back to Defendant. [Id. at ¶ 10]. Defendant, "upon information and belief, knew that its products would be shipped to North Carolina and knew that they would be distributed in the retail marketplace." [Id. at ¶ 12].

On or around October 20, 2016, Defendant transmitted a quotation to Plaintiff for the cost of manufacturing 500,000 spray bottles for dispensing Plaintiff's performance spray products. [Id. at ¶ 13]. Plaintiff received the quotation in Asheville, North Carolina. [Id.]. "On a number of occasions, [Defendant] shipped samples of manufactured products to [Plaintiff] in North Carolina for review by [Plaintiff] prior to [Defendant's] beginning full production of manufacturing of such products." [Id. at ¶ 14]. Plaintiff then placed three orders with Defendant. [Pl.'s Aff. ¶ 15]. Defendant received the orders and began producing "and delivering products to [Plaintiff]." [Id. at ¶ 16].

On at least three occasions, Defendant's representatives visited Plaintiff's facility in Asheville, North Carolina. [Id. at ¶ 17]. On or about March 23, 2107, Defendant's representative Paras Shah visited Plaintiff's facility in Asheville, North Carolina. [Id. at ¶ 18]. Paras Shah came to test samples of the defective product Defendant manufactured. [Id.]. On or about April 13, 2017, Defendant's representatives Paras Shah and Vikram Shah visited Plaintiff's facility in Asheville, North Carolina. [Id. at ¶ 19]. The two came to further test samples of the defective product Defendant manufactured. [Pl.'s Aff. ¶ 19]. On or about August 31, 2017, Defendant's representative Vikram Shah visited Plaintiff's facility in Asheville, North Carolina. [Id. at ¶ 20]. Vikram Shah presented a proposal to

13

Plaintiff for Defendant to rework the defective products and attempt to replace a defective component of the product. [Id.].

Plaintiff was not aware of any defects of the products Defendant manufactured until the products were received in North Carolina. [Id. at ¶ 21].

Plaintiff's Email and Letter. The email is dated October 11, 2017, from Plaintiff's counsel to Defendant via Vikram Shah. [# 17 Ex. 1, p. 1]. The letter identifies Plaintiff's counsel and informs Defendant that it has filed a complaint and attached it to the email. [Id. at pp. 1, 6–28]. The email then states the following:

> While it is my understanding that the parties have, in good faith, attempted to mediate a resolution of these matters through several meetings, it is clear that an acceptable solution which acknowledges the significant damages Relion has suffered as a result of Tri-Pac's breach is not immediately forthcoming.
>
> Relion remains willing to engage in further mediation in an effort to resolve the matter. Toward that end, I ask that you forward this correspondence to Tri-Pac's legal counsel. Please ask your attorney to contact me immediately. I am hopeful that we will be able to schedule a mutually convenient time to engage in additional mediation in Asheville, North Carolina in the very near future. [Id. at p. 1].

Attached to the email was a letter requesting Defendant preserve electronically stored information potentially relevant to the case. [Id. at pp. 3–4]. The letter was also sent by U.S. mail. [Id. at p. 3].

### c. Defendant's Second Affidavit & Email & Agreement—February 16, 2018

The Second Affidavit. Defendant' Reply [# 18] included a second affidavit is also from Vikram Shah who reaffirmed that everything in the second affidavit is "based upon my personal knowledge or upon information provided to me from authorized Tri-Pac

14

employees who inform me that these statements are true." [# 18 Ex. 3, ¶ 1] [hereinafter *Def.'s Aff. II*].

On November 15, 2016, Plaintiff's representatives Josh Montgomery and Mark Graham visited Defendant's facility in Michigan. [Def.'s Aff. II ¶ 2]. This visit occurred during Defendant's first production run of product for Plaintiff, and at that point Defendant had already filled numerous canisters. [Id. at ¶ 2]. Montgomery and Graham visited Defendant's facility to "to inspect and audit [Defendant's] manufacturing and packaging operations." [Id.]. The parties reviewed the "process layout, filling, and packaging." [Id.]. Montgomery and Graham inspected the product during the visit. [Id.]. They did not raise any complaints regarding the products or quality control procedures. [Id.].

Defendant's third party, including all third-party employees, it utilized in manufacturing Plaintiff's product is located in the Chicago, Illinois area. [Def.'s Aff. II. at ¶ 3]. Defendant believes that five of the third-party's employees will have relevant information regarding this case. [Id.].

Defendant's Email. Defendant's Reply also included an email from Plaintiff to Defendant dated November 15, 2016. [# 18 Ex. 1]. The email references Purchase Order No. 100798. [Id.]. Plaintiff states "[w]e will set-up shipment." [Id.]. The email then relates a preference on how to coordinate the shipment. [Id.].

The Agreement. Defendant also included a copy of the signed Commercial Agreement. [# 18 Ex. 2]. In this version, Plaintiff signed the Agreement on August 8, 2016 and then transmitted it to Defendant who signed on September 9, 2016. Defendant then alleges that on September 22, 2016, Plaintiff added his initials to the Agreement and that

15

these initial were superfluous. [*See* id. at p. 4].

### d. Defendant has Purposely Availed Itself to North Carolina

"Fairness is the touchstone of the jurisdictional inquiry, and the 'minimum contacts' test is premised on the concept that a corporation that enjoys the privilege of conducting business within in a state bears the reciprocal obligation of answering to legal proceedings there." Tire Eng'g, 682 F.3d at 301 (quoting CFA Inst., 551 F.3d at 293). A defendant's conduct with the state need only be such a connection that "it is fair for the defendant to defend itself in that state." Id. at 301 (quoting CFA Inst., 551 F.3d at 292 f.n 15). A court does not merely count contacts; instead, it takes into consideration the qualitative nature of each contact. Id. Thus, depending on the circumstances, a single contact could either satisfy the necessary 'quality and nature' of specific jurisdiction, or it may be too 'casual' or 'isolated' to trigger "an obligation to litigate in the forum." Id. (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317–18 (1945)) (internal reference omitted).

The purposeful-availment test is flexible. In its determination whether Defendant purposefully availed itself, the Court considered the Complaint and all other evidence provided by the parties with any ambiguities determined in favor of Plaintiff. In particular, the Court weighed heavily that Defendant entered into a Commercial Agreement with Plaintiff (regardless of where it was executed), there was extensive communication and collaboration between the parties, and Defendant sent employees to the forum state regarding a potential breach of contract with Plaintiff. Defendant attempts to qualify its representatives' presence in North Carolina, however, the Court was not persuaded. [*See* # 18 p. 3]. This is not a case of fleeting communication or where a defendant did not visit the

forum state. *See* Tire Eng'g, 682 F.3d at 302–03. Accordingly, the Court finds Defendant purposefully availed itself to North Carolina.

### e.  Plaintiff's Claims Arise from Activities Directed at the Forum State

"Where activity in the forum state is "the genesis of [the] dispute," is a prong that is satisfied. A plaintiff's claims similarly arise out of activities directed at the forum state if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim" Id. at 303 (quoting CFA Inst., 551 F.3d at 295).

The Court finds the parties in this case had substantial correspondence and collaboration, and Plaintiff is based in North Carolina. Therefore, the Court finds Plaintiff's claims arise from Defendant's activities which were directed at the Plaintiff in the State of North Carolina.

### f.  In this Case, Personal Jurisdiction is Constitutionally Reasonable

The heart of Defendant's attack on specific jurisdiction is that it would be constitutionally unreasonable. The Court disagrees.

A court evaluates if personal jurisdiction over an out-of-state defendant is constitutionally reasonable to ensure "litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a 'severe disadvantage in comparison to his opponent.'" CFA Inst., 551 F.3d at 296 (quoting Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001)). In its evaluation, a court will look at the burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief, the "interstate judicial system's interest in obtaining the most

17

efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)); Tire Eng'g, 682 F.3d at 303. "A corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome." Tire Eng'g, 682 F.3d at 303.

Burden on Defendant. Defendant argues its burden to litigate this case is great because it is based in Michigan. The Fourth Circuit, however, has upheld personal jurisdiction of a corporation located in India. CFA Inst., 551 F.3d at 296–97. Simply because litigation could carry some burden and expense to Defendant does not make it 'gravely difficult.' The Court, however, acknowledges Defendant's burden.

Interests of the Forum State. Defendant argues North Carolina has little interest in adjudicating the dispute because the alleged manufacturing defects did not occur in North Carolina. As authority, Defendant cites a 2007 District of Utah unpublished order adopting a magistrate's report and recommendation. See Riddle & Assocs., P.C. v. Morcos, No. 2:06-CV-972, 2007 WL 2061054 (D. Utah July 12, 2007). Morcos is distinguishable.

First, in Morcos, the magistrate found the only contacts between an out-of-state defendant and a Utah plaintiff were two letters sent by the defendant's pro bono legal counsel. Id. at *4. In the case at bar, there is more than fleeting communication: Defendant and Plaintiff entered into a Commercial Agreement, Defendant sent representatives to North Carolina, numerous emails and communication that appear collaborative in nature, etc. Clearly, the present case contains more contacts with the forum state than there were

18

in *Morcos*.

Second, the *Morcos* magistrate emphasized that a state's interest is providing a forum for its residents to seek redress for injuries caused by out-of-state actors. Id. Defendant's argument seems to miss the nuance that a plaintiff need only be injured by an out-of-state defendant and that the injury can occur inside or outside the forum state.

Third, the *Morcos* magistrate stated that in Utah where a defendant causes *tortious* injury outside the state, Utah's interest in obtaining jurisdiction over a defendant is diminished. *Morcos*, 2007 WL 2061054, at *4. In the instant case, Defendant argued *Morcos* stands for the proposition that a state's interest in adjudicating a plaintiff's dispute is "diminished were the injury occurred outside the forum state, despite plaintiff[] being a state resident." [# 6 Ex. 1, p. 12]. Defendant, however, neglects to explain or analogize how a tortious injury would compare to a breach of contract injury in a jurisdictional analysis. Regardless, the Court notes the location of injury is an obvious factor to consider and not necessarily dispositive.

Fourth, the magistrate found that the *Morcos* plaintiff could receive more efficient relief in another forum. *Morcos*, 2007 WL 2061054, at *4. There appears to be no factors in this case that give Plaintiff more efficient relief in another forum.

Accordingly, the Court does not find *Morcos* persuasive. The Court finds North Carolina has a strong interest in providing a forum for Plaintiff who has potentially suffered contractual injury by an out-of-state defendant.

Plaintiff's Interest in Obtaining Relief. The Court finds Plaintiff's relief interest is great. Defendant argues Plaintiff is not jeopardized by being directed to file suit in

19

Michigan. Not being jeopardized, however, is not the same as an interest in obtaining relief.

Efficient Resolution of Controversies. The Court finds this to be a neutral factor. The alternative for Plaintiff, if the Court does not find personal jurisdiction, is for Plaintiff to file suit in Michigan. The same burdens that Defendant currently argues it will have in litigation would transfer to Plaintiff. Further, it is a zero-sum game whether the Western District of Michigan or Western District of North Carolina adjudicates the matter. Neither option would clearly be more efficient than the other.

Furthering Fundamental Substantive Social Policies. Defendant argues that by finding personal jurisdiction over it, the Court would "discourage parties from cooperating to deal with disputes like this in the future." [# 18 p. 4]. The Court is not persuaded.

The Court finds Defendant's argument misguided. The Court fails to see how a determination that jurisdiction is constitutionally reasonable would impact a defendant's choice to attempt to resolve an issue with a client. In the modern world, a defendant who owns a new start-up might be unable to fly across the country and instead would attempt such a resolution by email or other mail services. Those emails and other mail services would themselves be more contacts with the forum state (in lieu of actually stepping into the forum state). The Court emphasizes that the determination of specific jurisdiction is not counting contacts but evaluating their qualitative nature.[5]

---

[5] Further, the Court finds unsettling Defendant's contention that by including a shipping clause stating 'F.O.B. Defendant's warehouse' it has washed its hands of any litigation outside its home state. While such a clause could be a factor, it is neither dispositive nor a forum selection clause, which itself must be reasonable. *See* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 16–17 (1972).

After considering the arguments, and the relevant law, the Court finds that exercising personal jurisdiction over Defendant—in this case—is constitutionally reasonable.

Therefore, the Court finds Defendant has purposefully availed itself to North Carolina, Plaintiff's claims arise from activity directed to North Carolina, and personal jurisdiction over Defendant is constitutionally reasonable. Plaintiff has provided a prima facie case for personal jurisdiction over Defendant by a preponderance of evidence. Accordingly, the Court will recommend Defendant's Motion to Dismiss be denied as to its assertion that the Court lacks personal jurisdiction.

**B. Transfer of Venue is Not Proper in this Case**

Defendant argues the Court should transfer this case to the Western District of Michigan, pursuant to 28 U.S.C. §§ 1631, 1404, or 1406. Because the Court has found that Plaintiff has provided a prima face case that the Court has personal jurisdiction over Defendant, the Court will dispense with a § 1631 analysis. Accordingly, the Court will now evaluate Defendant's other venue arguments.

Venue. Defendant asks the Court to transfer this case to the Western District of Michigan because Defendant argues venue is improper under 28 U.S.C. § 1391.

"To survive a motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff need only make a prima facie showing of venue." Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004). Subsequent to 1990, venue may be proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28

21

U.S.C. § 1391(b)(2). "[I]n determining whether events or omissions are sufficiently substantial to support venue . . . a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review "the entire sequence of events underlying the claim."" Mitrano, 377 F.3d at 405 (quoting Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001)). While venue may be proper where a defendant moves to transfer, "it is possible for venue to be proper in more than one judicial district." Id. Thus, a court's inquiry is not to determine where venue *could* be proper; rather, the inquiry is whether venue is proper where Plaintiff seeks relief.

In this case, Plaintiff is headquartered in Asheville, North Carolina. After some online research, Plaintiff found Defendant's website and began communications that would lead to a Commercial Agreement. The Court puts aside the disputed issue of where the contract was executed. After the Agreement came into effect, Defendant sent Plaintiff a quotation for its manufacturing services of certain spray products. Plaintiff submitted three purchase orders. Defendant began its production. At some point in the production, there became an issue with the product. It was not until Plaintiff received the product in North Carolina, that the issue with the product became apparent. Plaintiff and Defendant communicated regarding the problem. Defendant assured Plaintiff that it was looking into fixing the issue. Eventually Defendant manufactured most or every item Plaintiff had ordered. All of the product ended up with Plaintiff in North Carolina. There remained an issue with the product. Defendant sent representatives down to North Carolina three separate times to inspect and in an attempt to ameliorate the problem. Plaintiff rejected Defendant's proposed ideas as they would be ineffective. Plaintiff sent Defendant a

preliminary accounting of its losses. Plaintiff requested Defendant to dispose of the product, which was still in North Carolina. The damages Plaintiff claims are felt by the Plaintiff in North Carolina.

Based on these facts the Court finds venue in the Western District of North Carolina is proper.[6] The Court will recommend this case not be dismissed or transferred based on improper venue.

Transfer under § 1404. Title 28 U.S.C. § 1404(a) allows district courts to transfer cases for convenience of the parties and witnesses, and in the interest of justice, to any other jurisdiction where it might have been brought. The decision to transfer under § 1404(a) "rests in the discretion of the District Judge." Akers v. Norfolk & Western Railway Co., 378 F.2d 78, 80 (4th Cir. 1967). A plaintiff's primary right to choose the forum is "a selection not easily to be overthrown." Id. In determining a § 1404(a) motion to change venue, the Court will consider many factors:

> (1) plaintiff's initial choice of the forum; (2) the residence of the parties; (3) the relative ease of access to sources of proof; (4) availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; (5) possibility of view of premises, if view would be appropriate to the action; (6) enforceability of a judgment if one is obtained; (7) relative advantages and obstacles to a fair trial; (8) all other practical problems that make a trial easy, expeditious, and inexpensive; (9) administrative difficulties of court congestion; (10) local interests in having localized controversies settled at home and the appropriateness in having

---

[6] See, e.g., Production Grp. Intern., Inc. v. Goldman, 337 F. Supp. 2d 788, 798–99 (E.D. Va. 2004); see also T. and B. Equip. Co., Inc. v. RI, Inc., No. 3:15-CV-337, 2015 WL 5013875, at *4 (E.D. Va. Aug. 24, 2015); 3A Composites USA, Inc. v. United Indus., Inc., No. 5:13-CV-83-RLV-DCK, 2013 WL 5536937, at *3–*4 (W.D.N.C. Oct. 4, 2013); FBR Capital Markets & Co. v. Short, No. 1:09-CV-1016, 2009 WL 3254458, at *3–*4 (E.D. Va. Oct. 9, 2009); Mineo Corp. v. Rowe, No. 2:07-CV-57-H, 2009 WL 10689420, at *9–*10 (E.D.N.C. Sept. 16, 2009). But cf. Med. Protective Co. v. Bolick, No. 1:14-CV-58, 2015 WL 7301232, at *2–*3 (W.D. Va. Nov. 18, 2015).

the trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflict of laws.

Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.,751 F. Supp. 93, 96 (W.D.N.C. 1990). The analysis of these factors is "qualitative, not merely quantitative." Id.

The first factor weighs in favor of Plaintiff. Plaintiff filed its case in the Western District of North Carolina.

The second factor is neutral. Plaintiff is a North Carolina corporation. Defendant is a Michigan corporation.

The third factor weighs in favor of Plaintiff. It appears the alleged faulty product in question may still be in North Carolina. Any other sources of proof appear to be documents and email communications.

The fourth factor appears to be neutral or slightly in Defendant's favor. Defendant's willing witnesses reside in Michigan. Plaintiff's willing witnesses reside in North Carolina. Defendant argues it may need to call other willing witnesses from the Chicago, Illinois area. Defendant states it would be more economical to have Chicago witnesses drive to Grand Rapids or Kalamazoo. While this at first appears to favor Defendant, the Court takes notice that it is approximately a 150-mile drive from Chicago to Kalamazoo—the closest federal courthouse in the Western District of Michigan. From Chicago to Asheville is less than a two-hour flight. While cost of a flight versus cost of gasoline might favor driving, it is not compelling enough for the Court to weigh this factor heavily in favor of Defendant. Either way, Defendant would be asking out-of-state witnesses to travel. Neither party mentioned the possibility of an unwilling witness.

The Court finds the fifth factor neutral. Based on the claims in the Complaint, the Court finds that a view of Defendant's facilities or the third-party facility in Chicago not necessary or helpful in this case.

The sixth factor is neutral. The Court finds enforceability to be the same regardless of where judgment is obtained.

The seventh factor is neutral. There does not appear to be any significant advantage or obstacle to a fair trial.

The Court finds the eighth factor to weigh slightly in Defendant's favor. Defendant may have an increased financial burden defending this case in the Western District of North Carolina should it require witnesses from Chicago. Otherwise, the cost appears to be the same whether the case is brought in North Carolina or Michigan.

Factor nine is neutral. The Court finds the administrative difficulties of court congestion to not be an issue in this case.

Factors ten and eleven are neutral. The parties directly dispute whether North Carolina or Michigan contract law governs the case. It appears that the District Court must find facts to determine this issue. Accordingly, for this recommendation, this factor is neutral.

After considering the qualitative nature of each factor, the Court will recommend Defendant's motion to transfer be denied.

## C. Defendant's 12(b)(6) Motion

### a. Condition Precedent of Mediation

After reviewing the docket, it appears this issue is now moot because the parties

have engaged in professional mediation. [# 19].

### b. Outside Damages

The Court finds Defendant's argument in favor of limiting damages is best served after discovery. Accordingly, the Court will recommend denying Defendant's motion to dismiss as to the issue of damages.

## IV. Conclusion

The Court **RECOMMENDS** the District Court **DENY** Defendant's Motion to Dismiss [# 6] and allow this case to proceed.

Signed: May 22, 2018

Dennis L. Howell
United States Magistrate Judge

## Time for Objections

The parties are hereby advised, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).